STATE, Plaintiff in error and Cross-Respondent, v. CLARK, Defendant in error and Cross-Appellant.

Supreme Court

*No. 77–361–CR. Submitted on briefs November 1, 1978.—*
*Decided February 27, 1979.*
(Also reported in 275 N.W.2d 715.)

806

For the defendant in error the cause was submitted on the briefs of *Howard B. Eisenberg,* state public defender, and *Melvin F. Greenberg,* assistant state public defender.

For the plaintiff in error the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, and *Marguerite M. Moeller,* assistant attorney general.

WILLIAM G. CALLOW, J.  The defendant, Homer Lewis Clark, was convicted following a jury trial of second-degree sexual assault contrary to sec. 940.225 (2) (e), Stats. The defendant brought postverdict motions seeking a judgment of acquittal and, alternatively, a new trial. The trial court denied the motion for a judgment of acquittal but ordered a new trial on the ground that it erred in admitting the complainant's testimony that she never had sexual intercourse prior to the incident in question. The state seeks review of the order granting a new trial; the defendant appeals from the order denying judgment of acquittal. We conclude the trial court abused its discretion in granting a new trial and correctly denied the motion for entry of a judgment of acquittal notwithstanding the verdict.

On March 7, 1977, the defendant was charged in a criminal complaint with committing second-degree sexual assault contrary to sec. 940.225 (2) (e), Stats.[1] The

---

[1] "940.225 Sexual assault.

. . . .

"(2) SECOND DEGREE SEXUAL ASSAULT. Whoever does any of the following shall be fined not more than $10,000 or imprisoned not more than 10 years or both:

". . . .

charge arose out of the defendant's alleged sexual contact with a fifteen-year-old girl. The defendant pleaded not guilty and after a jury trial was convicted of second-degree sexual assault.

D. T., fifteen years of age, testified that she was baby-sitting for the three children, ages nine, seven, and three or four, of Bill and Alma Miner at the Patricia Miner residence on March 5, 1977. At about 2 a.m. she awoke to the sound of someone hollering. She saw the defendant, whom she knew because he was once married to her aunt, standing at the entrance to the living room. The defendant asked where "Peachy" and

"(e) Has sexual contact or sexual intercourse with a person who is over the age of 12 years and under the age of 18 years without consent of that person, as consent is defined in sub. (4).

". . . .

"(4) CONSENT. "Consent", as used in this section, means words or overt actions by a person who is competent to give informed consent indicating a freely given agreement to have sexual intercourse or sexual contact. A person under 15 years of age is incapable of consent as a matter of law. The following persons are presumed incapable of consent but the presumption may be rebutted by competent evidence, subject to the provisions of s. 972.11(2):

"(a) A person who is 15 to 17 years of age.

"(b) A person suffering from a mental illness or defect which impairs capacity to appraise personal conduct.

"(c) A person who is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

"(5) DEFINITIONS. In this section:

"(a) "Intimate parts" includes the breast, buttock, anus, penis, vagina or pubic mound of a human being.

"(b) "Sexual contact" means any intentional touching of the intimate parts, clothed or unclothed, of a person to the intimate parts, clothed or unclothed, of another, or the intentional touching by hand, mouth or object of the intimate parts, clothed or unclothed, of another, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification or if such touching contains the elements of actual or attempted battery as defined in s. 940.20."

"Punk," Patricia Miner and her sister, were. She told him, and they began to talk about the defendant's ex-wife, their children, and sex. The defendant asked if she ever had intercourse and whether she wanted to have sex. She testified that she answered no to both questions. Defense counsel made no objection or motion to strike. The defendant and D. T. talked some more, but D. T. could not recall what was said. The defendant went next door to get some beer. D. T. testified that she was afraid of the defendant, but it did not occur to her to lock the door. The telephone did not work.

When the defendant returned, he asked if she wanted to play cards. She replied no, but he insisted, and the two went into the kitchen and she began to shuffle the cards. The defendant started to "feel [her] up" through her clothes. She pushed his hand away, but he put it back. He told her that if she did not drink a can of beer, "he would have intercourse with [her]." She testified that he did not have a weapon, but she was afraid.

The defendant pulled her up from the table by her arm and guided her into the living room. They sat on the couch, and she began to drink a beer. He unbuttoned her blouse, pushed her bra up, and began to suck on her breasts. He pushed her back so that she was lying down. She did not remember trying to resist him but testified that she thought she told him to "knock it off." She testified he decided he was going to have intercourse with her and then pulled her pants down, brought his own trousers down, and put his penis part way into her vagina. She testified, without objection, that she had never seen a penis before that night except in a school sex education picture. He decided to go into the bedroom and told her to pick up her clothes. He guided her into the bedroom where she lay down on the bed because she "knew what was going to happen." He did not reach a climax. She did

not kiss the defendant or put her arms around him, but at his request she did wrap her legs around his body. They had engaged in intercourse for at least five minutes. The children's parents, Bill and Alma Miner, arrived. The defendant got off her, and she went to the bathroom for a few minutes and used some tissue paper because she was bleeding. On cross-examination, defense counsel asked why she was bleeding. She replied, "He broke my hymen, I guess—that's what I learned." D. T. then went out to the living room where the defendant was talking with Bill and Alma. She did not tell them what had just happened.

The defendant drank beer and talked with Bill, and D. T. talked with Alma for an hour or two. Christine LaMere, with whom D. T. lived, arrived with Alex LaMere at about 5:30 or 6:00 a.m. After about ten minutes, D. T. and Christine went to the car where D. T. told Christine that she was raped. Christine went back to tell Alex, who took D. T. to the police. The police took her to the hospital. Over defense objection, she testified that she never had intercourse with anyone before the incident in question.

Police officer William Crothers testified that at 6:15 a.m. on March 5, 1977, he took the defendant, who had a bruise or laceration on the back of his head resulting from striking his head on the restraining cage in the squad car, to the hospital and then to the county jail. He said that the defendant alternately slept and awoke yelling on the way to the hospital and appeared to be under the influence of intoxicants.

Traffic officer Aaron Ealens testified that he met D. T. at the Miner residence on March 5, 1977. She told him "[a]bout playing cards, about the beer and so forth, but she was very vague about the other acts," but he "understood what was going on." Ealens took her to the hospital.

A clinical neurologist, testifying for the defendant, said he tested the defendant for organic brain damage but found none. He said the defendant may not have remembered the incident in question because of his heavy drinking and head injury.

The gynecologist who examined D. T. at 7:16 on the morning of March 5, 1977, testified there was no evidence of injury to her pelvic area, although her vulvar surface was slightly reddened. That did not indicate sexual contact, however. There was no bleeding visible and no sperm present. The doctor found remnants of yellow tissue paper on the vulvar surface. On cross-examination by the prosecutor, the doctor testifed as follows:

"*Q.* What is the hymen?
"*A.* The hymen is just a—a skin fold at the entrance of the vagina.
"*Q.* Was that intact when you examined [D. T.]?
"*A.* By 'intact,' or 'non-intactness,' of the hymen does not demonstrate anything.
"*Q.* Was it intact Doctor?
"*A.* I was able to pass a speculum into the vagina, and the hymen—the hymen can be stretchable. This does not say anything. In other words, women never having has (sic) sexual contact might have just this particular skin fold in a very small amount. I think the lay person has a kind of erroneous idea in the imagination about the hymen, that the hymen is something— either that it's there or not there, but that is not in the anatomy, that is not the case.
"*Q.* What is the case?
"*A.* There are as many variations of hymens as there are females."

The defendant testified that he remembered going to the Miner residence where D. T. answered his knock at the door. He asked for Peachy and Punk, and she told him they were not around and invited him in. He sat down for a few minutes and then went next door

to get some beer. He returned with a twelve pack and sat at the kitchen table to drink a beer. He got up to go to the bathroom, and when he returned, D. T. was in the living room. He sat down on the sofa in the living room and finished his beer. When he got up to get another one, he noticed that D. T. had taken a can. He remembered they talked about his ex-wife and children. D. T. asked him if he enjoyed sex, and he said yes. He asked her if she ever had sex with a boy. His next recollection is of talking to "two other groups," relatives of Pat Miner, and somebody "roughing [him] up" and putting him in a squad car. The defendant remembered no sexual contact between himself and D. T. He testified finally that as of March 5, 1977, he had last changed his underwear the day before and could not remember picking up any girls the day prior to the alleged incident. The parties stipulated to the admission of a laboratory report showing seminal material and intact spermatozoa on the lower front of the defendant's shirt and his undershorts.

There were no objections to the jury instructions. Part of the instructions follow:

"The third element requires that [D. T.] did not consent to the sexual contact.

"Consent means words or overt actions by a person indicating a freely given agreement to have sexual contact. A person who has not attained the age of 18 years is presumed incapable of consent, but the presumption may be rebutted by competent evidence. Evidence has been received that [D. T.] had not attained the age of 18 years at the time of sexual contact. If you find beyond a reasonable doubt that [D. T.] had not attained the age of 18 years at the time of sexual contact, then you may find from that fact alone that she did not consent; but you are not required to do so and you should not so find unless you are satisfied beyond a reasonable doubt from all the evidence."

After deliberating for four and one-half hours, the jury returned with the question whether it should consider the events occurring after the initial touching of the breast. The court, after hearing counsel, told the jury that the charge was "sexual contact" but that the jury was to take into account everything that happened. The jury returned a half hour later with a verdict finding the defendant guilty of second-degree sexual assault.

The defendant moved for an order directing judgment of acquittal on the ground that the evidence was insufficient and that it showed D. T. had consented and, alternatively, for a new trial on the ground that the court erred in admitting evidence that D. T. had not had sexual intercourse before the night in question. The court denied the motion for an order directing a judgment of acquittal but granted the alternative motion for a new trial, conceding that it was error to receive D. T.'s testimony that she had not had intercourse before. The state seeks review by writ of error of the order granting a new trial; the defendant appeals from the order denying judgment of acquittal.

Two questions are presented: (1) Was the evidence sufficient to permit the jury to find beyond a reasonable doubt that D. T. did not consent to sexual contact with the defendant? (2) Did the trial court abuse its discretion in ordering a new trial on the ground that it was error to receive evidence concerning D. T.'s chastity?

The defendant argues that the evidence was insufficient to permit the jury to find beyond a reasonable doubt that D. T. did not consent to sexual contact with the defendant. The burden is on the state to prove each element of the offense beyond a reasonable doubt. *State v. Davidson,* 44 Wis.2d 177, 191, 170 N.W.2d 755 (1969); *In re Winship,* 397 U.S. 358 (1970). Where the sufficiency of the evidence is challenged on appeal, the

question is whether the evidence, considered most favorably to the state, is "so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as beyond a reasonable doubt." *Kanieski v. Gagnon,* 54 Wis.2d 108, 113, 194 N.W.2d 808 (1972). The concept of reasonable doubt does not exclude every possible doubt but is rather that degree of moral certitude based on convincing reason and excluding all doubt as to the existence of a different conclusion based on reasons. *State v. Gresens,* 40 Wis.2d 179, 182, 161 N.W.2d 245 (1968).

A brief examination of sec. 940.225, Stats., provides a useful background against which to appraise the trial court's decision not to grant a judgment of acquittal notwithstanding the verdict. Under the statute, consent to sexual contact requires (1) words or overt acts indicating a freely given agreement to have sexual contact by (2) a person competent to give informed consent. The statute presumes D. T. incapable of consent, but the presumption is rebuttable by competent evidence. In Wisconsin, presumptions in criminal cases create permissible inferences. Sec. (Rule) 903.03, Stats.[2]

---

[2] "903.03 **Presumptions in criminal cases.** (1) SCOPE. Except as otherwise provided by statute, in criminal cases, presumptions against an accused, recognized at common law or created by statute, including statutory provisions that certain facts are prima facie evidence of other facts or of guilt, are governed by this rule.

"(2) SUBMISSION TO JURY. The judge is not authorized to direct the jury to find a presumed fact against the accused. When the presumed fact establishes guilt or is an element of the offense or negatives a defense, the judge may submit the question of guilt or of the existence of the presumed fact to the jury, if, but only if, a reasonable juror on the evidence as a whole, including the

Where the presumed fact is an element of the crime, the trial court may submit the question of its existence to the jury only if a reasonable juror, on all the evidence, could find the presumed fact beyond a reasonable doubt. The court must instruct the jury that it is entitled to regard the basic fact as sufficient proof of the presumed fact, but need not do so, and moreover that the jury must find on the evidence as a whole the existence of the presumed fact beyond a reasonable doubt. Here the jury was so instructed.

The defendant argues that, notwithstanding the presumption of incapacity to consent, the evidence showed no resistance to sexual contact but demonstrated passive cooperation in the defendant's advances. The state argues that it need not show resistance but simply the lack of affirmative agreement to have sexual contact. The plain wording of the statutory definition of consent demonstrates that failure to resist is not consent; the statute requires "words" or "overt acts" demonstrating "freely given consent."

Viewing the evidence favorably to the state and in light of the statutory presumption against capacity to

---

evidence of the basic facts, could find guilt or the presumed fact beyond a reasonable doubt. When the presumed fact has a lesser effect, its existence may be submitted to the jury if the basic facts are supported by substantial evidence, or are otherwise established, unless the evidence as a whole negatives the existence of the presumed fact.

"(3) INSTRUCTING THE JURY. Whenever the existence of a presumed fact against the accused is submitted to the jury, the judge shall give an instruction that the law declares that the jury may regard the basic facts as sufficient evidence of the presumed fact but does not require it to do so. In addition, if the presumed fact establishes guilt or is an element of the offense or negatives a defense, the judge shall instruct the jury that its existence must, on all the evidence, be proved beyond a reasonable doubt."

consent and the requirement of affirmative assent, the jury verdict is supportable. While some of D. T.'s acts are arguably ambiguous or even demonstrative of consent, a reasonable juror could well have concluded beyond a reasonable doubt on the evidence that D. T. did not consent but merely responded to directions. D. T. specifically told the defendant she did not want to have sex. When the defendant touched D. T's breast, she pushed his hand away, but he put it back. Her actions which might otherwise be considered indicative of consent are explained by her testimony that she was afraid of the defendant.

The defendant argues that D. T.'s testimony was so unreliable that it is insufficient as a matter of law to sustain a conviction. He points to her inability to remember various things and to the gynecologist's testimony which impeached D. T.'s testimony that she was bleeding. These observations affect D. T.'s credibility but do not make her testimony incredible as a matter of law. Generally, testimony must be in conflict with nature or fully established or conceded facts to be so " 'inherently or patently incredible' " that this court will substitute its judgment for that of the jury. *Wildman v. State,* 69 Wis. 2d 610, 613, 230 N.W.2d 809 (1975) ; *Chapman v. State,* 69 Wis.2d 581, 583, 230 N.W.2d 824 (1975). *Compare: O'Boyle v. State,* 100 Wis. 296, 300, 75 N.W. 989 (1898) (testimony of prosecutrix presents "several physical improbabilities, if not impossibilities") ; *Donovan v. State,* 140 Wis. 570, 220 N.W. 1022 (1909) (testimony "intrinsically improbable and almost incredible"). The test to be applied here is not whether the trial court or a reviewing court is convinced of the defendant's guilt beyond a reasonable doubt but whether the jury, acting reasonably, could have been so convinced that a sexual assault occurred in that the defendant had sexual contact without

D. T.'s consent. *Berg v. State*, 41 Wis.2d 729, 165 N.W.2d 189 (1969). Sexual contact includes, but is not limited to, sexual intercourse. Sec. 940.225(5)(b), Stats.

The state concedes that the trial court erred in admitting D. T.'s testimony that she did not have intercourse before the incident in question. It argues that the error was harmless, and therefore the trial court erred in ordering a new trial. The decision to grant a new trial because of error is within the discretion of the trial court. If, however, a new trial is granted where the error has not prejudiced the moving party, that is an error of law requiring reversal. *Kletsch v. Waukesha County*, 61 Wis. 2d 662, 664, 213 N.W.2d 367 (1974); *Holtz v. Fogarty*, 270 Wis. 647, 72 N.W.2d 411 (1955).

Sec. 972.11(2)(b), Stats., excludes, with certain exceptions not here relevant, evidence of the complainant's prior sexual conduct in prosecutions under sec. 940.225, Stats. The question on review of the order granting a new trial is whether the conceded error was prejudicial.

The testimony at issue here could not have had more than a slight effect on the jury in view of all the evidence. The defense failed to object or move to strike D. T.'s testimony at the outset of the trial that she responded "no" to the defendant's inquiries whether she ever had sex and whether she wanted to that evening. D. T.'s chastity was strongly implied when she testified without objection that she had never before seen a real penis. Defense counsel asked D. T. what caused the bleeding, and she replied, "He broke my hymen, I guess—that's what I learned." Though a gynecologist had earlier testified that a hymen implied nothing about prior chastity, D. T.'s testimony that she thought he broke her hyman, an act commonly associated in lay terms with a first act of

sexual intercourse, mitigates the effect on the jury of the erroneously admitted virginity testimony. Any sympathy for D. T. or belief that she did not consent, which might have derived from her statement that she had not had sexual intercourse before, would indeed, be slight in light of this testimony. The error was harmless under any test for nonconstitutional error.[3] *State v. Jennaro,* 76 Wis.2d 499, 509–10, 251 N.W.2d 800 (1977); *Wold v. State,* 57 Wis.2d 344, 356–57, 204 N.W.2d 482 (1973). The trial court thus erred in granting a new trial.

Because the admission of D. T.'s testimony that she never before had intercourse was harmless error, the trial court abused its discretion in ordering a new trial. We are, therefore, required to reverse the order and remand the case with instructions to enter a judgment of conviction. In light of our holding that the evidence was sufficient to permit a reasonable jury to find beyond a reasonable doubt that D. T. did not consent to the defendant's sexual contact, we are unpersuaded by the defendant's argument that the "interests of justice" preclude such a result.

*By the Court.*—Order affirmed in part, reversed in part, and remanded with instructions to enter a judgment of conviction.

---

[3] The defendant invokes the standard for harmless *constitutional* error. *See: Chapman v. California,* 386 U.S. 18, 24 (1967). The error here was admission of testimony in violation of state law; this in no way rises to the level of deprivation of the right to a fair trial guaranteed by the Sixth and Fourteenth Amendments. Even if the cases cited by the defendant, *Government of the Virgin Islands v. John,* 447 F.2d 69 (3d Cir. 1971); *Hicks v. Hiatt,* 64 F. Supp. 238 (M.D. Pa. 1946), can be read to imply that, they are based on an assumption rejected by our legislature in sec. 972.11(2), Stats., that evidence of prior sexual conduct has great probative value in determining lack of consent.