# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1573

JARRETT M. ADAMS,

*Petitioner-Appellant*,

*v.*

DANIEL BERTRAND,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 C 389—**J. P. Stadtmueller**, *Judge.*

ARGUED FEBRUARY 21, 2006—DECIDED JUNE 30, 2006

Before MANION, WOOD, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* A Wisconsin jury convicted Jarrett Adams, along with Dimitri Henley, of five counts of second-degree sexual assault, and Adams was sentenced to twenty-eight years in prison. Adams appealed his conviction to the Wisconsin Court of Appeals and the Wisconsin Supreme Court, neither of which granted him relief. Having exhausted his state court remedies, Adams filed a petition for a writ of habeas corpus in the Eastern District of Wisconsin, challenging both the sufficiency of the evidence and the effectiveness of his trial counsel. The district court denied

his petition. We reverse the district court's decision based on the constitutional deficiencies of his trial counsel.

I.

In September 1998, Jarrett Adams, Dimitri Henley, and Rovaughn Hill, three men from Chicago, were selling cologne at the University of Wisconsin at Whitewater shortly before fall semester classes were to begin.[1] On the evening of September 5, the men were playing video games in the dorm room of Shawn Demain, a freshman whom they had met during their sales rounds. Meanwhile, S.E.S.[2], a female freshman who resided in the same dorm as Demain, and S.E.S.'s roommate, Heidi Sheets, were attending a party a few blocks away. While at the party, S.E.S. had approximately three or four beers. Upon returning to the dorm later that evening, the women went to Demain's dorm room, where they first met the three men from Chicago.

At trial,[3] Sheets and S.E.S. offered different stories of what happened next. Sheets claimed that both women invited the

---

[1] The record does not make clear whether this was a legitimate business nor whether the men were selling door-to-door in the dorm. However, the propriety of their presence on the campus is not an issue in this case.

[2] Both parties refer to the victim of the sexual assault as S.E.S., which is consistent with the state and district court pleadings. We adopt the same convention.

[3] The "trial" refers to the trial of Jarrett Adams and Dimitri Henley on February 8-9, 2000. All three men had been tried together the previous year, which resulted in a mistrial because of an improper attempt by the state to amend its charges at the close of the evidence.

men up to their room, which was located three floors above Demain's. While the men and S.E.S. proceeded to the room, Sheets went down the hall for approximately twenty-five minutes to speak with another friend. According to S.E.S., however, neither she nor Sheets invited the three men to their room. Rather, she left Demain's room by herself and went to her room. When she opened the door to her room, the three men suddenly appeared at the door and barged in, telling S.E.S. to put on music so that they could dance. After selecting a compact disc, the men took turns dancing provocatively with S.E.S., groping her breasts and grabbing her crotch. She claimed she did not resist because she was scared. The situation deteriorated further. One of the men pulled S.E.S. onto Sheets's bed, and Adams, standing before her, pulled down his pants, leaving him with only his boxers on.

At this point, Sheets entered the room. Both Sheets and S.E.S. testified that Sheets became upset and stormed out of the room. S.E.S. followed Sheets out of the room, and none of the men restrained her from doing so. Sheets entered another room on the same floor, but refused to let S.E.S. inside. Through the closed door, S.E.S. asked Sheets whether she was mad at her and overheard Sheets calling her a slut. During her time in the hall, S.E.S. never indicated that anything was amiss or attempted to enter another room. After waiting a few minutes, S.E.S. left the door and decided to go downstairs instead of returning to her room. Upon reaching the staircase, however, she came across Hill waiting for her. He turned S.E.S. around, directing her back to her room where the other men were waiting.

Upon returning to her room, the men ordered her to sit on the floor, and S.E.S. complied, sitting on the floor with her legs crossed "Indian style." Shortly thereafter Adams told

her to lie down, which S.E.S. did. Adams tried to remove her pants, while S.E.S. kept her knees close together in an attempt to stop him. Eventually, however, in the face of Adams's continued tugging, she relaxed her legs. He removed S.E.S.'s pants and underwear, and then proceeded to have sex with her. After Adams stopped, the other men took turns having sex with S.E.S. During this time, one of the men also rubbed his penis against her face, telling her to "suck this," as S.E.S. turned her face to avoid it.

The three men left, and S.E.S. called her boyfriend, Joshua Lodwick. Although S.E.S. did not want to go to the hospital or talk to the police, Lodwick and others convinced her to do both. Adams, Hill, and Henley were eventually charged with second-degree sexual assault. They were first tried together in 1999, but that trial resulted in a mistrial after the state attempted to amend its charges after the close of evidence. Subsequently, Adams and Henley were tried together. Later, Hill was tried separately.

At the second trial, both John Fiske, Adams's lawyer, and Steve Luchsinger, Henley's lawyer, cross-examined S.E.S. about earlier statements to her treating doctor and at the first trial, pointing out inconsistencies among various accounts she had given. Adams and Henley offered no defense witnesses, choosing instead to rely on their perception that the state failed to prove all the elements of second-degree sexual assault. The jury, however, found Adams and Henley guilty on all five counts. Hill, on the other hand, called defense witnesses at his subsequent trial, including Demain, who testified that he saw S.E.S. smoking cigarettes with the three men after the alleged assault occurred. This trial ended in a hung jury. While the state renewed its prosecution of Hill later, the court eventually dismissed the case against Hill because the state had failed to turn over certain police investigation notes to the defense.

On appeal, Adams mounted a challenge to the sufficiency of the evidence, as well as various decisions made by his trial counsel. The Wisconsin Court of Appeals affirmed the conviction, and the Wisconsin Supreme Court denied review. Adams then proceeded to the Eastern District of Wisconsin, where he filed a petition for a writ of habeas corpus, again challenging the sufficiency of the evidence and his attorney's performance. The district court denied the petition, finding the evidence sufficient to support Adams's convictions and that his attorney made reasonable strategic trial choices.

## II.

Before this court, Adams again challenges the sufficiency of the evidence and his counsel's effectiveness. Adams first claims that the state failed to establish that his sexual contact with S.E.S. involved either the use or threat of force or lack of consent, each of which is a required element to prove second-degree sexual assault in Wisconsin. Adams also argues that his trial attorney was constitutionally ineffective based on several events at trial. Specifically, Adams challenges his counsel's failure to request a jury instruction for a lesser included offense, his decision not to vigorously cross-examine S.E.S., and his failure to properly investigate Demain.

On appeal from a denial of habeas corpus relief, we review issues of law de novo and issues of fact for clear error. *See Perry v. McCaughtry*, 308 F.3d 682, 688 (7th Cir. 2002). To qualify for habeas relief, Adams must show that the state court proceedings adjudicating his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *See also Van Patten v. Deppisch*, 434 F.3d 1038, 1042 (7th Cir. 2006); *Bintz v. Bertrand*, 403 F.3d 859, 865 (7th Cir. 2005). A state court decision constitutes an unreasonable application of clearly established federal law if the state court correctly identifies the governing legal principle from Supreme Court jurisprudence but unreasonably applies that principle to the facts of the present case. *See Dunlap v. Hepp*, 436 F.3d 739, 741 (7th Cir. 2006). We have previously explained that an unreasonable decision, in this context, is one "well outside the boundaries of permissible differences of opinion." *McFowler v. Jaimet*, 349 F.3d 436, 455 (7th Cir. 2003).

### A.

Adams first mounts challenges to the sufficiency of the evidence that established two of the elements of second-degree sexual assault. On direct appeal, the Wisconsin Court of Appeals reviewed Adams's sufficiency claims under the standard annunciated in *State v. Poellinger*, 451 N.W.2d 752, 755 (Wis. 1990): "an appellate court may not reverse a conviction unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." Wisconsin effectively duplicates the Supreme Court standard for sufficiency challenges, *see Jackson v. Virginia*, 443 U.S. 307, 324 (1979), and Adams does not claim that the Wisconsin Court of Appeals applied the wrong standard.[4] Rather,

---

[4] As this court has repeatedly stated on habeas review, a

(continued...)

Adams suggests that the Court of Appeals applied the proper standard unreasonably.

Wisconsin defines the crime of second-degree sexual assault as "sexual contact or sexual intercourse with another person without consent of that person by use or threat of force or violence." Wis. Stat. § 940.225(2)(a). Turning to Adams's initial challenge, he contends that the state failed to prove the "use or threat of force or violence" element. A Wisconsin court has previously explained:

> The "use or threat of force or violence element of violence" element of second-degree sexual assault under Wis. Stat. § 940.225(2)(a) is satisfied if the use or threat of force or violence is directed to compelling the victim's submission. The element is satisfied whether the force is used or threatened as part of the sexual contact or whether it is used or threatened as part of the sexual contact to compel the victim's submission.

*State v. Hayes*, 681 N.W.2d 203, 215 (Wis. 2004). The Wisconsin Supreme Court has clearly stated that "use of force" would include both forcible contact or the force used as the means of making contact. *See State v. Bonds*, 477 N.W.2d 265, 267 (Wis. 1991). To put it another way, force used during the sexual act or contact to compel submission can satisfy the statute, not just force prior to the actual sexual act. In *Bonds*,

---

[4] (...continued)
state court need not cite to the applicable Supreme Court case annunciating the standard, as long as the state court precedent cited agrees with it. *See, e.g., Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) ("A state court need not even be aware of Supreme Court precedent so long as neither the reasoning nor the result of the state-court decision contradicts them.") (internal citations omitted).

for example, the Wisconsin Supreme Court found that "forcibly grabbing her nipple and then squeezing and pulling it" sufficed for the force element of second- degree sexual assault, though it also was the extent of the sexual contact. *Id.* at 265. In addition to the use of actual force, a threat of force that compels submission also satisfies this requirement. "The message conveyed by a threat is determined by the context in which it occurs." *State v. Jaworski*, 400 N.W.2d 29, 30-31 (Wis. Ct. App. 1986). This determination requires an examination of such factors as the place where the event occurred, the victim's understanding of the threat, and physical disparities between victim and assailant. *See id.*

The Wisconsin Court of Appeals did not dwell very long on Adams's sufficiency challenge, simply concluding that "[t]he victim's testimony, if believed, was sufficient to support the charges the jury was instructed on." *Wisconsin v. Adams*, No. 02-0039-CR, 2002 Wisc. App. LEXIS 1214, at *9-10 (Nov. 7, 2002). Viewing the evidence in the light most favorable to the conviction, we agree that sufficient evidence established both use of force and threats of force. Specifically, S.E.S. testified that the men groped her breasts and crotch while dancing with her in her room. After she followed Sheets out of the room, she stated that she attempted to go downstairs, only to have one of the men physically turn her around and lead her back into the room. Upon her return to the room, she attempted to keep her legs together, but Adams persisted in taking off her pants and underwear. While S.E.S. did not want him to do this, she eventually could no longer keep her legs together in light of his repeated attempts. All of these actions were uses of force to compel her submission to sexual contact or intercourse. While this is not a case of a beating or extreme violence against S.E.S., the statute does not require that type of force.

It only requires force to compel submission—precisely what happened here according to S.E.S.'s testimony.

Moreover, even if there were insufficient evidence of actual force, sufficient evidence supported a finding of a threat of force. As stated above, threats of force are evaluated based on the context in which they accrue. *See Jaworski*, 400 N.W.2d at 30-31. Viewing the evidence in the light most favorable to the conviction, the context in this case establishes a threat directed to obtaining S.E.S.'s submission. S.E.S. testified that as she entered her room, she was surprised by three men that she barely knew, who followed her into her room uninvited. The men then ordered her to put on music and groped her while dancing. One of the men pulled her onto a bed, while Adams dropped his pants. She was able to leave the situation temporarily when she unsuccessfully tried to enter another room where her roommate had relocated. When she attempted to go downstairs, she was met at the stairwell by one of the men and returned to her room. At that time, the room was dark, and she was surrounded by three men who ordered to sit down, then lie down, with Adams proceeding to take off her pants and underwear despite her attempts to prevent him. While this case does not feature an explicit threat, given the number of men, their orders to S.E.S., and their aggressive, sexually-charged actions despite her unwillingness, the context described by S.E.S. was one of intimidation geared to making her submit to sexual intercourse. The Wisconsin Court of Appeals, therefore, applied *Jackson* reasonably to the force element.

Adams also argues that the evidence of lack of consent was insufficient. Wisconsin defines consent as "words or overt actions by a person who is competent to give informed consent indicating a freely given agreement to have sexual intercourse or sexual contact." Wis. Stat. § 940.225(4).

Adams relies on the fact that S.E.S. eventually took part in the sexual intercourse as an overt act indicating consent. However, such a reading would hollow out the consent requirement, basically removing from the realm of sexual assault any instance when the victim did not overtly resist. "A victim of sexual assault is not required to resist the assault to establish that the act was nonconsensual." *State v. O'Brien*, 588 N.W.2d 8, 18 (Wis. 1999); *see also State v. Clark*, 275 N.W.2d 715, 721 (Wis. 1979). At trial, S.E.S. expressly testified that the men engaged in intercourse with her without her giving any verbal consent. Moreover, S.E.S. stated that she committed no overt acts that would suggest consent to the men, instead testifying that she complied with their orders out of fear. A reasonable juror could have concluded that she merely followed directions rather than gave consent. *See Clark*, 275 N.W.2d at 721. The state, therefore, introduced sufficient evidence that would allow a jury to conclude neither words nor overt actions supplied the necessary consent element. Again, the conclusion of the Wisconsin Court of Appeals was not unreasonable.

## B.

Turning to Adams's second group of claims, he brands his trial counsel constitutionally deficient because of a number of questionable trial decisions. The Wisconsin Court of Appeals properly referenced *Strickland v. Washington*, 466 U.S. 668 (1984), in its evaluation of Adams's ineffective assistance challenges. The well-known *Strickland* analysis requires Adams to demonstrate that: (1) his counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance caused him prejudice. *See, e.g., Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir.

2004); *Perry*, 308 F.3d at 688. Regarding the performance inquiry, we presume that counsel's actions "fall within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and defer to strategic decision-making by a trial attorney, *see Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002). *See also Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2002) ("Our review of the performance of counsel must be highly deferential.") (internal citations omitted). Despite this weighty deference, we nonetheless must carefully consider whether the attorney brought to bear the skill and knowledge that allows for a proper adversarial testing process, considering all the circumstances. *See Hough*, 272 F.3d at 890-91. To succeed in meeting the prejudice prong of *Strickland*, Adams must further show a reasonable probability that, but for counsel's errors, the result of the proceeding would be different. *See id.*; *see also Brown*, 304 F.3d at 691. A reasonable probability is defined as one that is sufficient to undermine confidence in an outcome. *See Strickland*, 466 U.S. at 694. "On a habeas appeal, we look at [the *Strickland*] test not directly, but rather ask whether the lower court made a reasonable application of this law to the facts of this case." *Floyd v. Hanks*, 364 F.3d 847, 850 (7th Cir. 2004).

In this case, Adams points to three main instances of substandard performance by trial counsel. First, he argues that Fiske unreasonably failed to request a jury instruction regarding third-degree sexual assault. Second, he contends that Fiske erred by not vigorously cross-examining S.E.S. or clearly presenting various inconsistencies among her descriptions of events. Finally, and most substantially, Adams claims that his trial counsel failed in his duty to conduct a reasonable investigation by not locating and talking to Demain, who could have conceivably served as a witness on Adams's behalf.

### 1. Jury Instructions

Adams claims that Fiske failed in his professional duties by not seeking a jury instruction for the lesser included offense of third-degree sexual assault. In Wisconsin, third-degree sexual assault is "sexual intercourse with a person without consent of that person." Wis. Stat. § 940.225(3). Basically, this offense has the same requirements as second-degree sexual assault, except it does not necessitate any showing of force. Adams believes that, given the paucity of evidence relating to force at his trial, Fiske should have requested this additional instruction rather than rely upon an all-or-nothing gamble.

Fiske did not overstep the bounds of professional competence in this respect. According to Fiske's testimony during a post-conviction proceeding, he was aware of the lesser included offense of third-degree sexual assault, and he understood its constituent elements, including the lack of a force requirement. Fiske, however, decided that allowing the main offense to stand on its own would make it more difficult for the government to prove, given the case's weaknesses. He chose to bring the lack of evidence of force into clear view, which he believed would compel the jury to acquit on the second-degree charges. Fiske discussed this strategy with his client, and it comported with Adams's claims and overall defense— complete innocence of anything other than consensual sex. Fiske believed that the inclusion of a lesser count instruction would look like grasping at straws given this theory of innocence.

We cannot conclude that this choice was professionally unreasonable. The strategy Adams now advocates has some initial appeal in hindsight, as the jury obviously found that the evidence of force was sufficient. That tactic, however,

while it might ensure a smaller prison sentence, would also increase the chance of conviction on some charge. Fiske's strategy, on the other hand, while somewhat risky, could have led to a complete acquittal had the jury agreed that proof of force was lacking. Counsel's decision here dwells in the region of tactics and strategy, and the Wisconsin Court of Appeals did not act unreasonably when concluding that Fiske had not committed a *Strickland* error.

### 2. Cross-Examination

Adams also asserts that his counsel failed to vigorously confront S.E.S. with various prior inconsistent statements about the assault. At the post-conviction hearing, Fiske testified that he reviewed S.E.S.'s statements to doctors, as well as testimony from prior hearings and the initial trial. As mentioned before, Adams was tried jointly with Henley. Fiske, along with Henley's counsel, Luchsinger, decided on a common trial strategy. Specifically, the attorneys agreed that, rather than both attacking perceived inconsistencies, Luchsinger would be the more aggressive in the cross-examination of S.E.S. This strategy was born out of concern that if both lawyers aggressively confronted the assault victim, it might alienate members of the jury sympathetic to her. Nonetheless, Fiske felt confident that either Luchsinger or himself would (and did) address all inconsistencies at trial. Fiske articulated plausible strategic reasons for his actions, and the Wisconsin Court of Appeals again reached a reasonable conclusion.

### 3. Investigation into Demain

Finally, Adams alleges that Fiske acted unreasonably when he failed to locate and call Demain as a witness. As we

have noted repeatedly, a lawyer owes his client " 'a duty to
make reasonable investigation or to make a reason-
able decision that makes particular investigations unnec-
essary,' and a failure to investigate can certainly consti-
tute ineffective assistance." *Washington v. Smith*, 219 F.3d
620, 631 (7th Cir. 2000) (quoting *Strickland*, 466 U.S. at 691);
*See also Harris*, 365 F.3d at 555-56; *Brown*, 304 F.3d at 691.
The Wisconsin Court of Appeals concluded that Fiske
reasonably chose to limit investigations into Demain
because he had decided not to call any defense witnesses as
part of his strategy. *Adams*, 2002 Wisc. App. LEXIS 1214, at
*5-6.

We disagree. The "failure to investigate a particular lead
may be excused if a lawyer has made a 'reasonable decision
that makes particular investigations unnecessary.' " *Wash-
ington*, 219 F.3d at 631 (quoting *Strickland*, 466 U.S. at 691).
"In our assessment of counsel's actions, we evaluate coun-
sel's conduct from the perspective at the time the decision
was made to forgo the investigation." *Brown*, 304 F.3d at
692. Here, Fiske made an unreasonable decision not to
investigate Demain because Fiske possessed knowledge,
before the trial, that Demain could have swung the case in
his client's favor.[5]

Fiske knew that Demain, like Sheets, appeared throughout
all accounts of the events, both before the assault and after,
and thus was a witness to several key moments in the

---

[5] As stated previously (and which will be discussed below), the
trial that resulted in Adams's conviction was actually the sec-
ond trial in this matter. In the first trial, the state presented all of
its evidence, but the district court granted a mistrial based on
an improper amendment of the charges after the close of the
evidence.

chronology. Unlike any other witness, Demain had no prior relationship with either the men or S.E.S., thus rendering him impartial and independent. Demain could explain what occurred in his room prior to the sexual encounter, including whether he heard the women invite the men to visit their room and what happened when S.E.S. left his room. Further, the police report, which Adams's attorney reviewed as part of his preparations, contained a statement from Demain that he witnessed S.E.S. downstairs with the three men after the time of the sexual encounter. Demain, therefore, appeared to be a witness who could shed considerable, perhaps conclusive, light on the events of that night.

Demain gained added importance given Fiske's unique, and enviable, position of having seen the state's entire case against his client. As mentioned, the initial trial of Adams, Henley, and Hill ended in a mistrial after the presentation of the state's case because of the state's improper attempt to amend a pleading. Fiske and the other attorneys witnessed a dress rehearsal of the state's case and could prepare accordingly before the second trial. Fiske knew that Sheets and S.E.S. did not agree on whether the women invited the men up to their room before the sexual encounter. Demain, who was in the room at the time, could have resolved this dispute in Sheets's favor, and thus completely undercut S.E.S.'s version of uninvited strangers bursting into her room. Moreover, Fiske reviewed the police report that indicated that Demain saw S.E.S. with the men later that night. This would seem to strongly contradict S.E.S.'s story of a sexual assault, the men quickly leaving the scene, and S.E.S. calling her boyfriend immediately following the alleged rape. Instead, this would support a plausible theory of a consensual encounter between the men and S.E.S., thus damaging the state's theory of the case.

Demain was not an irrelevant bystander. Rather, he was present at two crucial events where the evidence is sharply conflicting. Given the testimony at the first trial, it was essential that Demain be found in order to determine what he saw and heard before informed decisions about strategy (no defense witnesses) could be made. Although Fiske made minimal attempts to locate Demain, when the initial attempts failed, he let the matter drop. Fiske did not hire an investigator, and his total efforts were comprised of asking witnesses and the University Demain's location. As Luchsinger, the co-defendant's counsel, admitted during a postconviction proceeding, he and Fiske had no real strategic reason for their decision not to call Demain besides "that we were not going to present a defense and ride that horse, hoping that no defense would carry, would outweigh the advantages of a favorable witness." Despite the fact that Fiske had the benefit of hearing the prosecution's case before a mistrial, knew the relevant inconsistencies in the stories, and was aware that Demain had information about these crucial facts and could resolve these key points in his client's favor, he chose not to track down Demain because he had already decided not to call witnesses in the second trial. This knowing disregard was unreasonable. *See Washington* at 631.

Fiske committed to a predetermined strategy without a reasonable investigation that could have produced a pivotal witness. Therefore we find that the conclusion of the Wisconsin Supreme Court (that Fiske's decision not to call defense witnesses without first locating and interviewing Demain was reasonable trial strategy) was not a reasonable application of the first prong of *Strickland*.

Turning to the second prong of the *Strickland* analysis,[6] we ask whether there is a reasonable probability that, but for Fiske's error, the trial result would be different. *See Strickland*, 466 U.S. at 691. As mentioned previously, a reasonable probability is one undermining our confidence in an outcome. *See id*. at 694. In this case, Adams has established prejudice from the failure to investigate and call Demain. This was a very close case, and its outcome was highly contingent on the credibility of S.E.S. Looking at Demain's testimony in Hill's trial (and in the police report), he was able to place S.E.S. with the men smoking cigarettes after the alleged assault. He also testified that the women left with two of the men and that they were going to the women's dorm room. In addition, he testified that the third man, Hill, stayed behind for about thirty minutes playing a video game. This could have helped explain why S.E.S. encountered Hill on the stairs after her closed-door conversation with Sheets. Such testimony completely contradicts S.E.S.'s description of the events of that night. Nor can we blind ourselves to the results of Hill's trials. Hill, who was charged with precisely the same offenses as Henley and Adams, was tried in February 2001 and presented Demain's testimony. This trial resulted in a hung jury. Eventually, the charges against Hill were dismissed at a later trial because of the prosecution's failure to turn over police notes regarding their investigation. We do not contend that the result from Hill's trial would necessarily dictate the same result had Fiske investigated Demain. But the outcome of that trial, together with Demain's testimony and the relatively thin evidence presented at Adams's trial, does undermine

---

[6] As the Wisconsin Court of Appeals concluded that counsel's actions regarding Demain were reasonable, it did not, nor was required to, inquire into prejudice.

our confidence in the outcome, such that there is a reasonable probability that the outcome of Adams's trial would be different.

### III.

Adams failed to show that the Wisconsin Court of Appeals acted unreasonably when it found sufficient evidence to support his convictions. His trial counsel's failure to investigate properly a crucial witness, stemming from an intransigence regarding his trial strategy, however, constituted ineffective assistance of counsel. The Wisconsin Court of Appeals acted unreasonably in its application of *Strickland* to the facts on this point. We, therefore, REVERSE the decision of the district court and REMAND with instructions to grant the writ, unless the state gives Adams a new trial within 120 days.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*
