# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP1565-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　Plaintiff-Respondent-Petitioner,<br>　　v.<br>Ryan Hugh Mulhern,<br>　　　　Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 394 Wis. 2d 839, 953 N.W.2d 102
(2020 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 21, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 9, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Pierce |
| JUDGE: | Joseph D. Boles |

JUSTICES:

ROGGENSACK, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, HAGEDORN, and KAROFSKY, JJ., joined. ZIEGLER, C.J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Sarah L. Burgundy*, assistant attorney general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sarah L. Burgundy*.

For the defendant-appellant, there was a brief filed by *Dennis Schertz* and *Schertz Lase Office*, Hudson. There was an oral argument by *Dennis Schertz*.

No. 2019AP1565-CR
(L.C. No. 2016CF255)

STATE OF WISCONSIN : IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**State of Wisconsin,**

    **Plaintiff-Respondent-Petitioner,**

    **v.**

**Ryan Hugh Mulhern,**

    **Defendant-Appellant.**

**FILED**

**JUN 21, 2022**

Sheila T. Reiff
Clerk of Supreme Court

ROGGENSACK, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, HAGEDORN, and KAROFSKY, JJ., joined. ZIEGLER, C.J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined.

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, J. We review the court of appeals' decision[1] reversing the circuit court's[2] conviction of Ryan Mulhern for one count of second-degree sexual assault and one count of misdemeanor bail jumping. On appeal, the State

---

[1] *State v. Mulhern*, No. 2019AP1565-CR, unpublished slip op. (Wis. Ct. App. Oct. 6, 2020) (per curiam).

[2] The Honorable Joseph D. Boles of Pierce County Circuit Court presided.

asks us to reverse the court of appeals, arguing that evidence of the victim's lack of sexual intercourse is not prior "sexual conduct" pursuant to Wis. Stat. § 972.11(2)(a)-(b) (2017-2018)[3] (collectively referred to as the "rape shield" statute). Further, the State argues that, even if the victim's testimony was inadmissible, the error was harmless.

¶2 We conclude that the broad language used to define "sexual conduct" in the rape shield statute's prohibition includes evidence concerning the victim's lack of sexual intercourse. Therefore, the victim's testimony in this case regarding her lack of sexual intercourse in the week prior to the sexual assault was improperly admitted. However, we also conclude that, absent the rape shield evidence, a rational jury would have found Ryan Mulhern guilty of second-degree sexual assault beyond a reasonable doubt. Therefore, the circuit court's error in admitting the victim's testimony was harmless.

## I. BACKGROUND

¶3 This case arises out of a sexual assault committed by Ryan Mulhern against his friend, "Lisa."[4] The State charged Mulhern with one count of second-degree sexual assault, one count of strangulation and suffocation, and one count of misdemeanor bail jumping. The case proceeded to trial, during which, Lisa testified to the assault and the events that took

---

[3] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[4] Consistent with the policy underlying Wis. Stat. § (Rule) 809.86, we refer to the victim using a pseudonym.

place in its aftermath.  She testified that in the late hours of November 21, 2016, Mulhern texted her and asked to come over to her house, claiming that he was having personal issues and sounded "upset" and "frantic."  Lisa agreed to let Mulhern come over for the night, but told him that he would be sleeping on the futon and that she "would be there for him as a friend, and that would be all it was."

¶4   Mulhern arrived around midnight and, rather than speak to Lisa about the personal issues going on in his life, he continually turned the conversation to Lisa and her life.  After a while, Lisa told Mulhern that she needed to go to sleep because she had an exam the next morning.  She directed Mulhern to the futon in the living room.  Lisa went upstairs to her bedroom, but Mulhern persisted.

¶5   Lisa got into bed and under the covers.  Mulhern laid on top of the covers and put his arm around her.  While Lisa tolerated this contact, she continued to try to make it "abundantly clear that [she] needed to get to [sleep and that she] was not interested in anything else."

¶6   Mulhern then began to kiss Lisa, who pushed him away, told him to stop, and reminded him that he was in a relationship.  Mulhern relented and promised to leave if Lisa would give him a single kiss.  Lisa gave him a peck on the lips and told him to leave.  Instead, Mulhern became more aggressive. He held Lisa's head and shoulders down as he kissed her mouth, face, and neck.  Mulhern got out of bed, removed his clothes, and got under the covers with Lisa.

3

¶7 Mulhern pressed his erect penis against her bottom and began trying to put his hands up her shirt and down her pants. When Lisa protested and tried to slap his hands away, Mulhern grew angrier and more forceful. He pinned her against the wall and removed her pants. Mulhern maneuvered between her legs and Lisa felt his penis enter her. As he did this, Lisa struggled to breathe. Mulhern pressed his forearm against her throat and her head lay over the edge of the bed. She tried to yell for a roommate, who was not home, but she "could barely get her name out." As she tried to scream, Mulhern covered her mouth and nose with his hand. She bit his hand and attempted to scream again.

¶8 Lisa's next recollection was being curled up on the bed and Mulhern standing at the end of the bed and looking "apologetic and concerned." He asked Lisa why she was so upset and offered to get her something to drink. He left only after Lisa threatened to call the police. As soon as Mulhern left, Lisa called a friend and told her what had happened with Mulhern.

¶9 Later that morning, Lisa called a local sexual assault resources team ("SART") and was told to meet them at the hospital for an examination. At the hospital, Lisa was examined by a SART nurse who testified that she had numerous injuries consistent with an assault. These injuries included tenderness and tightness on her neck, a sore throat, a semicircular wound on her right shoulder, and tenderness on her right chest wall, inner thighs, and inner calves. Additionally, the nurse

4

detailed that Lisa had significant injuries to her genital area, including tenderness on her inner and outer labia, a linear tear to the left inner labia, an abrasion on her right vaginal wall, and redness on the left vaginal wall.

¶10 Shortly after leaving the hospital, Lisa saw a friend and told him about the assault. The friend later testified that Lisa was distraught and cried when she told him about it. Lisa further testified that the next day, she called the River Falls Police Department, interviewed with an officer, and told the officer what had occurred with Mulhern. Later that week, Lisa went home for Thanksgiving and told her mother about the assault.

¶11 Following Lisa's testimony, a DNA analyst from the State Crime Lab testified that he used DNA taken from Lisa's hospital visit and tested it for identification purposes. He tested a sample of saliva-based DNA taken from Lisa's neck and matched it to Mulhern. The analyst also tested a vaginal swab and found the presence of male DNA, but concluded that there was not a large enough sample to determine whose DNA it was. The analyst further testified that a body's natural processes will remove foreign DNA deposited into a vagina after a period of five days following an assault.

¶12 Following this testimony, the State, over defense counsel's objection, attempted to recall Lisa to the stand. It did so to ask Lisa whether she had sexual intercourse in the week prior to November 22, 2016. The circuit court allowed the question because, after reviewing the definition of "sexual

5

conduct" under the rape shield statute, it determined that Wis. Stat. § 972.11(2)(a) was limited to affirmative acts and, therefore, the proposed testimony regarding Lisa's lack of sexual intercourse fell outside the rape shield statute. When Lisa was asked whether she had sexual intercourse in the prior week, she answered that she had not. Mulhern was not given the opportunity to re-cross examine Lisa.

¶13 Finally, Mulhern took the stand and told his version of the events of November 22. He testified that Lisa invited him over that night and he went over to talk and catch up. After he was confronted with his text messages to Lisa, he acknowledged that his testimony was not accurate and that it was he who had asked to come to Lisa's apartment because he was "about to have a nervous breakdown." Next, Mulhern stated that Lisa had never limited the interaction to just speaking "as friends" or that she told him to sleep on the futon downstairs. He was forced to also recant this testimony by his text messages to Lisa.

¶14 Mulhern also testified that, after talking for a while, they began to kiss consensually. He denied that Lisa ever voiced any resistance or told him to stop. Then, they both removed their own clothes and Mulhern began to kiss Lisa on her breasts, neck, collarbones, and hips. When Mulhern was about to insert his penis into Lisa's vagina, she suddenly yelled at him to stop and he left her home. Mulhern testified that Lisa had contacted him twice after the incident. The first time, she asked whether Mulhern had ejaculated inside of her, to which he

6

denied penetrating her. After asking that question, Lisa told Mulhern never to contact her again.

¶15 Following testimony and closing arguments, in which the State referenced the analyst's five-day time period as well as Lisa's testimony regarding her lack of sexual intercourse in the week preceding the assault, the jury convicted Mulhern of second-degree assault. Based on the terms of a plea agreement, because Mulhern was found guilty of the sexual assault charge, he was also found guilty of the misdemeanor bail jumping charge. However, the jury acquitted him of the strangulation charge. Mulhern appealed his convictions.

¶16 The court of appeals reversed. State v. Mulhern, No. 2019AP1565-CR, unpublished slip op., ¶34 (Wis. Ct. App. Oct. 6, 2020) (per curiam). At the court of appeals, the State conceded that the circuit court erroneously exercised its discretion by admitting the challenged portion of Lisa's testimony, but asserted that the error was harmless. Id., ¶¶23-24. The court of appeals disagreed and concluded that the State had not met its burden to prove beyond a reasonable doubt that a rational jury would have convicted Mulhern absent the circuit court's error. Id., ¶¶27, 34. Specifically, the court of appeals noted that the State relied heavily on Lisa's testimony and the DNA analyst's five-day window to construct a factual timeline that corroborated its theory of guilt in the case. Id., ¶33. This timeline was highlighted in its closing argument. Id. We granted the State's petition for review, and now reverse the court of appeals.

7

## II. DISCUSSION

### A. Standard of Review

¶17 This case involves questions of statutory interpretation and application. Statutory interpretation and application present questions of law that we independently review, while benefitting from decisions of the circuit court and the court of appeals. Marder v. Bd. of Regents of the Univ. of Wis. Sys., 2005 WI 159, ¶19, 286 Wis. 2d 252, 706 N.W.2d 110.

¶18 We determine whether the circuit court's decision to admit evidence was an erroneous exercise of discretion. State v. Sullivan, 216 Wis. 2d 768, 780, 576 N.W.2d 30 (1998). "A circuit court erroneously exercises its discretion if it applies an improper legal standard or makes a decision not reasonably supported by the facts of record." Weborg v. Jenny, 2012 WI 67, ¶41, 341 Wis. 2d 668, 816 N.W.2d 191 (quoting Johnson v. Cintas Corp. No. 2, 2012 WI 31, ¶22, 339 Wis. 2d 493, 811 N.W.2d 756). A circuit court's erroneous exercise of discretion in admitting evidence is subject to the harmless error rule. State v. Hunt, 2014 WI 102, ¶21, 360 Wis. 2d 576, 851 N.W.2d 434 (citing State v. Harris, 2008 WI 15, ¶85, 307 Wis. 2d 555, 745 N.W.2d 397). Whether the error was harmless presents a question of law that we review independently. Hunt, 360 Wis. 2d 576, ¶21 (citing State v. Jackson, 2014 WI 4, ¶44, 352 Wis. 2d 249, 841 N.W.2d 791).

B.  Wisconsin Stat. § 972.11(2)

¶19 The purpose of statutory interpretation is to determine what the words of the statute mean so that they may be given effect. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Therefore, statutory interpretation must begin with the language of the statute. If the meaning of the words are plain and unambiguous, a court's inquiry ends and there is no need to consult extrinsic sources of interpretation, such as legislative history. Id., ¶¶45, 46. Statutory language is given its "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id., ¶45 (citing Bruno v. Milwaukee Cnty., 2003 WI 28, ¶¶8, 20, 260 Wis. 2d 633, 660 N.W.2d 656).

¶20 In addition to the plain meaning of statutory words, "[c]ontext is important to meaning. So, too, is the structure of the statute in which the operative language appears." Kalal, 271 Wis. 2d 633, ¶46. Therefore, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results . . . [and] read where possible to give reasonable effect to every word, in order to avoid surplusage." Id. When courts interpret a statute, they are not at liberty to disregard "plain, clear words of the statute." Id. Context also can include the factual setting in

9

which the statute is interpreted. <u>Seider v. O'Connell</u>, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659.

¶21 Turning then to the statute at issue here, Wis. Stat. § 972.11(2) provides:

(a) In this subsection, "sexual conduct" means any conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life-style.

(b) If the defendant is accused of a crime under s. 940.225, 942.09, 948.02, 948.025, 948.05, 948.051, 948.06, 948.07, 948.08, 948.085, 948.09, or 948.095, or under s. 940.302(2), if the court finds that the crime was sexually motivated, as defined in s. 980.01(5), any evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct shall not be admitted into evidence during the course of the hearing or trial, nor shall any reference to such conduct be made in the presence of the jury, except the following, subject to s. 971.31(11):

1. Evidence of the complaining witness's past conduct with the defendant.

2. Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.

3. Evidence of prior untruthful allegations of sexual assault made by the complaining witness.

§ 972.11(2)(a)-(b).

¶22 We examine the text of Wis. Stat. § 972.11(2)(a) and (b) to determine whether para. (a)'s definition of "sexual conduct" includes a lack of "sexual intercourse." If a lack of

10

"sexual intercourse" is included within the statutory definition, does evidence of a victim's lack of "sexual intercourse" qualify for admission under one of para. (b)'s exceptions. We address each of these questions in turn. In doing so, it is helpful to begin with a reexamination of our past decisions that have involved the question of whether the rape shield statute's definition of "sexual conduct" includes a lack of sexual conduct.

### 1. Rape shield decisions

¶23 Wisconsin's rape shield statute was enacted in 1976 and, apart from updated cross-references, the two relevant paragraphs, Wis. Stat. § 972.11(2)(a)-(b), remain unchanged today. Three years after its enactment, in State v. Clark, a fifteen-year-old victim of sexual assault was allowed to testify "that she never had intercourse with anyone before the incident in question." State v. Clark, 87 Wis. 2d 804, 810, 275 N.W.2d 715 (1979). Following a postconviction motion, the circuit court reviewed the rape shield statute and concluded it had erred by allowing that testimony. Id. at 813. On appeal, one question presented was whether "it was error to receive evidence concerning [a victim's] chastity[.]"[5] Id. However, in briefing, the "state concede[d] that the trial court erred in admitting [the victim's] testimony that she did not have intercourse before the incident in question." Id. at 817. We accepted the

---

[5] The appeal in State v. Clark, 87 Wis. 2d 804, 275 N.W.2d 715 (1979), was filed before the court of appeals was part of Wisconsin's appellate procedure.

concession and did not interpret § 972.11(2)(a). Instead, we proceeded directly to a harmless error analysis.

¶24 In Gavigan, we again accepted the State's concession that the circuit court erred in admitting testimony of the victim's virginity prior to being assaulted. State v. Gavigan, 111 Wis. 2d 150, 158, 330 N.W.2d 571 (1983). In accepting the State's concession, we noted that:

> Sec. 972.11(2)(b), Stats., precludes the admission of "any evidence" pertaining to a complainant's prior sexual conduct or reputation. Nothing in the statute limits its applicability to prior affirmative acts. Rather, the plain meaning of the words "prior sexual conduct" includes the lack of sexual activity as well. Accordingly, we conclude a statement that a woman is a virgin is necessarily a comment on the woman's prior sexual conduct. The two references in question do not fall within any of the three exceptions listed in sec. 972.11(2)(b). Nor do they establish any fact independent of the complainant's prior sexual conduct which is relevant to an issue in the case. Therefore, the virginity testimony was inadmissible under the statute.

Id. at 158-59. However, despite this pronouncement that "the plain meaning of the words 'prior sexual conduct' includes the lack of sexual activity as well," id. at 159, we allowed evidence of the victim's virginity in regard to proof of lack of consent. Id. at 160.

¶25 We fashioned a test that would allow evidence to come in "only if" the evidence met the following conditions: (1) "[T]he evidence [] serve[d] to prove a fact independent of the complainant's prior sexual conduct which is relevant to an issue in the case." Id. at 157. (2) "[T]he probative value of the evidence [] outweigh[ed] any prejudice

12

caused by its relation to the complainant's prior sexual conduct." Id. (3) "[T]he jury's consideration of the evidence [] [was] limited to the purpose for which it was admitted." Id. at 157-58.

¶26 Following Gavigan's court-made exception, the legislature amended Wis. Stat. § 972.11(2) by adding para. (c). It provides:

> Notwithstanding s. 901.06, the limitation on the admission of evidence of or reference to the prior sexual conduct of the complaining witness in par. (b) applies regardless of the purpose of the admission or reference unless the admission is expressly permitted under par. (b) 1., 2. or 3.

§ 972.11(2)(c). This amendment limited the court from expanding the exceptions to § 972.11(2)(a) beyond those provided by the legislature in § 972.11(2)(b).

¶27 Following the amendment that added para. (c), the State has continued its practice of conceding that, for the purposes of an appeal, evidence of a victim's lack of prior sexual conduct is inadmissible under the rape shield statute and has proceeded to argue for harmless error. See, e.g., State v. Mitchell, 144 Wis. 2d 596, 600, 609, 424 N.W.2d 698 (1988) ("The defendant and state agree that under our prior cases 'prior sexual conduct' includes lack of prior sexual conduct, that is, virginity.").

¶28 However, in the matter now before us, the State has changed course and does not concede that Lisa's testimony regarding her lack of sexual intercourse during the week before the alleged sexual assault was admitted in error. Therefore, we

13

have occasion to interpret the definition of "sexual conduct" in Wis. Stat. § 972.11(2)(a).

¶29 We recently held in State v. Bell that "[p]rior sexual conduct includes a lack of sexual conduct, meaning that evidence that a complainant had never had sexual intercourse is inadmissible." State v. Bell, 2018 WI 28, ¶63, 380 Wis. 2d 616, 909 N.W.2d 750. Seeking to escape from this statement, the State asserts that this language should be ignored because its "reasoning on that point was a reiteration of an adopted concession in a case decided over three decades ago."[6]

## 2. Rape shield evidence

¶30 Wisconsin Stat. § 972.11(2)(a) defines "sexual conduct" as "any conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life-style." § 972.11(2)(a). We interpret and apply its provisions in regard to Lisa's testimony that she did not have sexual intercourse in the week preceding the assault.

¶31 First, we note that "sexual conduct" is linked in the statutory definition to "any conduct or behavior relating to sexual activities of the complaining witness." Wis. Stat. § 972.11(2)(a). "Sexual activities" are not required to include prior sexual intercourse, although they may do so. Also, "conduct" is an alternative to "behavior" ("conduct or

---

[6] Pet. Br. at 11.

14

behavior") so long as it relates to sexual activities of the victim.

¶32 Second, "sexual conduct" is defined in Wis. Stat. § 972.11(2)(a) to include "living arrangement" and "life-style" if they relate to sexual activities of the victim. Therefore, para. (a) employs very broad terms in its definition of "sexual conduct," so long as "living arrangement" and "life-style" have a connection to the "sexual activities of the complaining witness." § 972.11(2)(a).

¶33 Third, the legislature chose to modify "conduct" with the word "any." "Any" is not defined in Wis. Stat. § 972.11(2). A dictionary definition provides that "any" is "one, some, or all indiscriminately of whatever quantity" or "some without reference to quantity or extent."[7] Therefore, the plain meaning of "sexual conduct" as defined in § 972.11(2)(a) includes a broad range of evidence to which para. (b) precludes admission except as specifically excepted in para. (b).

¶34 Furthermore, "relating," the gerund form of "relate," which is defined as "to show or establish logical or causal connection between,"[8] indicates that the statutory definition

---

[7] Any, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/any (last visited Mar. 23, 2022); see also State v. Sample, 215 Wis. 2d 487, 499, 573 N.W.2d 187 (1998) ("For purposes of statutory interpretation or construction, the common and approved usage of words may be established by consulting dictionary definitions.").

[8] Relate, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/relate (last visited Mar. 23, 2022).

15

does not narrowly limit the prohibition of evidence. Rather, it seeks to identify any evidence that has a causal or logical relationship to sexual conduct of a "complaining witness." The complaining witness's lack of sexual intercourse the week before the sexual assault at issue here bears a causal and logical connection to whether she participated in sexual conduct. Stated otherwise, Wis. Stat. § 972.11(2)(a)'s usage of "any" and "relating to" sets broad application that extends beyond a definition of evidence concerning affirmative acts. See Burbank Grease Servs., LLC v. Sokolowski, 2006 WI 103, ¶22, 294 Wis. 2d 274, 717 N.W.2d 781 ("'Any' is a very broad term."); Kalal, 271 Wis. 2d 633, ¶44.

¶35 In addition, the interpretation and application of statutory terms such as "life-style" and "living arrangement" under the particular facts of a given case, may cause para. (a) to be ambiguous. Seider, 236 Wis. 2d 211, ¶43 ("Permitting the facts of a case to gauge ambiguity simply acknowledges that reasonable minds can differ about a statute's application when the text is a constant but the circumstances to which the text may apply are kaleidoscopic."). That is, interpretations of Wis. Stat. § 972.11(2)(a) by reasonably well-informed persons may vary. Westmas v. Creekside Tree Serv., Inc., 2018 WI 12, ¶18, 379 Wis. 2d 471, 907 N.W.2d 68 (explaining that where a statute is capable of being understood by reasonably well-informed persons in two or more senses, the statute is ambiguous). However, the facts presented herein involve testimony concerning only sexual intercourse, not "life-style"

16

or "living arrangement." Accordingly, we do not address life-style or living arrangement and rely on a plain meaning definition of sexual intercourse for our discussion and decision.

¶36 As a means of disputing the conclusion that Lisa's lack of sexual intercourse in the week prior to the assault is sexual conduct to which Wis. Stat. § 972.11(2)(b) prohibits admission, the State cites People v. Sharpe, 918 N.W.2d 504 (Mich. 2018). Sharpe interprets a similar, but not identical rape shield statute, which the State argues is entitled to our consideration as interpretive of § 972.11(2). Under Michigan's rape shield statute, "[e]vidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted . . . ." Mich. Comp. Laws § 750.520j (2017-18).[9]

¶37 In Sharpe, the Michigan Supreme Court concluded that evidence that the victim "did not engage in other sexual intercourse in 2014 does not fall within the plain language of the rape-shield statute." Id at 513. It concluded that this "evidence demonstrate[d] an absence of conduct, not a 'specific

_____

[9] As with the Wisconsin rape shield statute, Michigan's rape shield statute allows for evidence to be admitted under delineated exceptions if "the judge finds that the . . . proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." Mich. Comp. Laws § 750.520j (2017-18). Neither of those exceptions was applicable to the analysis at hand.

17

instance' of sexual conduct. [And that to exclude] evidence of a lack of sexual partners under the rape-shield statute would render the phrase 'specific instances' meaningless." Id.

¶38 Importantly, in coming to this conclusion, the court distinguished words of the Michigan rape shield statute, which prohibit "specific instances" of a victim's prior sexual conduct from Wisconsin's rape shield statute, which prohibits "any evidence" of the victim's prior sexual conduct. Id. at 513 n.9 (comparing textual differences in state rape shield statutes).

¶39 The State, in disagreement with the Michigan Supreme Court, asserts that these are "distinctions [] without [a] difference."[10] We agree with the Michigan Supreme Court that these are dissimilar statutes, and therefore, whether evidence of a victim's lack of sexual intercourse is included in the plain meaning of Wis. Stat. § 972.11(2)(a)'s definition of "sexual conduct" is not assisted by Sharpe or the Michigan statute.

¶40 Next, we examine Wis. Stat. § 972.11(2)(b). It begins with a prohibition on the admittance of "any evidence" "concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct" that is stated differently than simply repeating the definition of "sexual conduct" expressed in para. (a). This case does not involve the opinions of others or

---

[10] Pet. Br. 23.

18

Lisa's reputation as to prior sexual conduct. Therefore, we do not address those provisions.

¶41 Instead, we move from Wis. Stat. § 972.11(2)(b)'s initial prohibition of the admission of evidence, to its three legislative exceptions, § 972.11(2)(b)1., 2. and 3. We do so to determine whether evidence of a victim's lack of sexual intercourse in the week prior to the sexual assault fits within a statutory exception to admission of evidence under the rape shield statute. Although para. (b) includes a prohibition of evidence of "sexual conduct" as defined in para. (a), the following evidence may be admissible:

> 1. Evidence of the complaining witness's past conduct with the defendant.
>
> 2. Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.
>
> 3. Evidence of prior untruthful allegations of sexual assault made by the complaining witness.

§ 972.11(2)(b).

¶42 After examination of testimony at issue in this case, we conclude that none of these exceptions is applicable to Lisa's testimony regarding her lack of sexual intercourse in the week prior to the assault because the State did not use this evidence for a statutory purpose: i.e., to determine "the degree of sexual assault or the extent of injury suffered." Wis. Stat. § 972.11(2)(b)2. Subsection (2) allows the use of "sexual conduct" evidence to discern the origin of semen,

19

pregnancy, or disease for purposes limited by statute. However, the State did not use the evidence obtained by vaginal swab for a listed statutory purpose. Rather, the State used it as proof that Lisa did not have sexual intercourse in the week prior to Mulhern's assault. Therefore, subsec. (2) cannot be a basis for the lawful introduction of Lisa's testimony.[11] Consequently, we conclude that Lisa's testimony, that she did not have sexual intercourse with anyone during the week preceding the assault, is barred by the broad language of the rape shield statute and, therefore, was erroneously admitted by the circuit court.

## C. Harmless Error

¶43 Because Lisa's testimony was admitted in error, we consider whether the circuit court's admission of that testimony was harmless. The erroneous admission of evidence is subject to the harmless error rule. See State v. Fishnick, 127 Wis. 2d 247, 267, 378 N.W.2d 272 (1985) (concluding that testimony was erroneously admitted but affirming conviction on harmless error grounds). Harmless error requires us to examine the error's effect on the jury. Hunt, 360 Wis. 2d 576, ¶26. For an error to be harmless, the party that benefitted from the erroneous admission (in this case, the State), must prove beyond a reasonable doubt that "a rational jury would have found the

---

[11] We conclude that neither of the other exceptions in Wis. Stat. § 972.11(2)(b) is applicable to the facts presented herein. Additionally, we decline to create or recognize any other exceptions not already stated in the text according to the legislature's most recent amendment to § 972.11(2). Cf. Wis. Stat. § 972.11(2)(c).

defendant guilty absent the error." Id. (quoting State v. Harvey, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189). We previously have articulated several factors to assist in a harmless error analysis, including but not limited to: "the importance of the erroneously admitted or excluded evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted or excluded evidence; the nature of the defense; the nature of the State's case; and the overall strength of the State's case." Hunt, 360 Wis. 2d 576, ¶27.

¶44 Here, the State asserts that, even without the erroneous admission of Lisa's testimony, there is still overwhelming evidence that proves beyond a reasonable doubt that a rational jury would have found Mulhern guilty of second-degree sexual assault. Although we acknowledge that Mulhern was denied the opportunity to re-cross examine Lisa and that the State relied on Lisa's inadmissible testimony in its closing arguments; we nonetheless recognize the overall strength of the State's case and conclude that the circuit court's error was harmless.

¶45 The SART nurse's testimony was crucial evidence presented to the jury. She testified about her physical examination of Lisa and the injuries that Lisa's body evidenced. She testified that Lisa had numerous physical injuries, including significant injuries to her genital area. She said that Lisa suffered a linear tear to her left inner labia, tenderness on her inner and outer labia, an abrasion on her right vaginal wall, and redness on the left vaginal wall. She

21

also testified that Lisa had tenderness and tightness on her neck, a sore throat, a semicircular wound on her right shoulder, and tenderness on her right chest wall, inner thighs, and inner calves. The nurse confirmed that Lisa's injuries were consistent with sexual assault and Lisa's recounting of what had happened to her. In essence, Lisa's injuries provided physical evidence that corroborated her description of Mulhern's assault, and they also contradicted Mulhern's version of his interaction with Lisa.

¶46 A DNA analyst from the State Crime Laboratory used DNA taken from Lisa's hospital visit and tested it for identification purposes. He tested a sample of saliva-based DNA taken from Lisa's neck and matched it to Mulhern. This placed him in physical contact with Lisa. The analyst also tested a vaginal swab and found the presence of male DNA; however, there was not a large enough sample to determine whose DNA it was.

¶47 Lisa also made contemporaneous reports of the sexual assault. Although we recognize that contemporaneous reporting may not always be indicative of the veracity of an allegation, we observe that immediately after it happened, Lisa called her roommate to let her know. Later that same day, she reported the assault to the SART nurse and met her at a hospital for an examination. After leaving the hospital, Lisa told a friend about the assault. The friend testified that Lisa was distraught and crying. The next day, Lisa called the River Falls Police Department, interviewed with an officer, and told the officer what had occurred with Mulhern. Later that same

week, Lisa told her mother about the assault while home for Thanksgiving.

¶48 Finally, Mulhern's own testimony, and his repeated retractions that were forced by his prior text messages, also support the jury's concluding beyond a reasonable doubt that he was guilty of sexual assault.  For example, Mulhern was required to retract his assertions that Lisa had been the one to invite him over, that she had never limited the interaction to just speaking "as friends," and that she told him to sleep on the futon downstairs.  Each of Mulhern's retractions made him less credible in the eyes of the jury and supported Lisa's report that he sexually assaulted her.

¶49 Attempting to discount the strength of the State's case and witness testimony, Mulhern argues that the jury's decision not to convict him of strangulation and suffocation casts doubt on Lisa's testimony as a whole.  The court of appeals agreed saying that the acquittal "suggests that the jury had a reasonable doubt as to whether [Lisa's] testimony fully and accurately described Mulhern's actions."[12]  However, the different outcomes on the sexual assault and strangulation charges are more reasonably explained by the difference in elements needed to prove each crime.

¶50 To convict Mulhern of strangulation and suffocation, the State was required to prove that Mulhern (1) intentionally (2) impeded Lisa's normal breathing or circulation of blood;

---

[12] Mulhern, No. 2019AP1565-CR, at ¶31.

(3) by applying pressure on the throat or neck or by blocking the nose or mouth. Wis. Stat. § 940.235(1).[13] By contrast, to convict Mulhern of second-degree sexual assault, the State was required to prove that Mulhern (1) had sexual intercourse (2) with Lisa (3) without consent (4) by use or threat of force or violence.[14]

¶51 Based on the required elements for each crime, it is reasonable that the jury concluded that there was enough evidence to convict Mulhern on the sexual assault charge and not on the strangulation charge. This is so because strangulation requires that the State prove that Mulhern acted with the "mental purpose to impede normal breathing or circulation of blood or was aware that [the] conduct was practically certain to cause that result." State v. Christel, Nos. 2020AP1127-CR & 2020AP1128-CR, unpublished slip op., ¶45 n.7, (Wis. Ct. App. Dec. 8, 2021) (quoting Wis JI—Criminal 1255 (2014)). The jury could have concluded that Mulhern used force to assault Lisa, but did not intend to stop her from breathing; rather, his covering her mouth was to limit her screams. The elements of

---

[13] In full, Wis. Stat. § 940.235(1) provides that "[w]hoever intentionally impedes the normal breathing or circulation of blood by applying pressure on the throat or neck or by blocking the nose or mouth of another person is guilty of a Class H felony."

[14] In full, Wis. Stat. § 940.225(2)(a) provides that whoever "[h]as sexual contact or sexual intercourse with another person without consent of that person by use or threat of force or violence" is guilty of a Class B Felony.

24

the two crimes are distinct; they do not overlap in regard to the facts needed to prove each crime.

¶52 Additionally, if we were to agree with Mulhern and the court of appeals that the jury may have doubted Lisa's testimony regarding strangulation, it does not follow that it would then simultaneously doubt her testimony regarding the sexual assault. This case was not simply a straightforward assessment of both parties' credibility. Instead, the inconsistencies inherent in Mulhern's testimony, combined with the consistency between Lisa's testimony and the physical evidence of bodily injury that Lisa suffered, prove beyond a reasonable doubt that a rational jury would have found Mulhern guilty of second-degree sexual assault without Lisa's testimony that she did not have sexual intercourse in the week before the assault. Therefore, we conclude that the circuit court's error in admitting that testimony was harmless.

III.  CONCLUSION

¶53  We conclude that the broad language used to define "sexual conduct" in the rape shield statute's prohibition includes evidence concerning the victim's lack of sexual intercourse.  Therefore, the victim's testimony in this case regarding her lack of sexual intercourse in the week prior to the sexual assault was improperly admitted.  However, we also conclude that, absent the rape shield evidence, a rational jury would have found Ryan Mulhern guilty of second-degree sexual assault beyond a reasonable doubt.  Therefore, the circuit court's error in admitting the victim's testimony was harmless.

*By the Court.*—The decision of the court of appeals reversed.

¶54 ANNETTE KINGSLAND ZIEGLER, C.J. *(concurring).* Ryan Mulhern was convicted of second-degree sexual assault. He now appeals claiming that because of the rape shield law, it was error for the victim, Lisa, to testify that she did not have intercourse with another individual the week prior to the assault. The majority agrees with Mulhern that admission of that testimony was in error, but the majority concludes that the error was harmless. I concur because the lack of sexual conduct is not sexual conduct, and the rape shield statute does not apply to Lisa's testimony. Lisa's testimony directly related to the defense asserted and the DNA expert's testimony. At a minimum, that testimony "opened the door" to the response she wished to offer. It was not error for the circuit court to admit Lisa's testimony into evidence.

¶55 Lisa testified that Mulhern sexually assaulted her on November 21, 2016. She reported the sexual assault shortly after it occurred, and physical evidence was collected soon thereafter. Mulhern's DNA was found on Lisa's neck. In addition, male DNA was found in her vagina, but the sample was not large enough to determine whose DNA it was.

¶56 At trial, Mulhern defended himself and asserted that Lisa was not telling the truth. He denied having sexual intercourse with Lisa. According to Mulhern, Lisa and he kissed and took off their clothes, but before they were about to have sex Lisa emotionally and without any warning yelled and demanded that he leave. Mulhern asserted that any male DNA found inside her vagina was not his, and therefore the DNA must have come

1

from someone else. Mulhern argued to the jury that "the only place they found DNA that they can attribute to [him] is on the back of her neck," and the accusations from "the State and [Lisa]" that accuse Mulhern "of having sexual intercourse . . . did not occur." In cross-examination of Lisa, Mulhern's counsel asked Lisa if she was "always completely truthful." Defense counsel then cross-examined the State's DNA expert and pointed out that, other than the DNA on Lisa's neck, there was "nothing else that [the DNA report] can attribute to Ryan Mulhern." Mulhern's counsel emphasized during the cross-examination that the DNA samples do not prove Mulhern's guilt. Specifically, Mulhern's counsel stated that "the samples [taken from Lisa's vagina] had a male contribute" but the expert "[did not] know whether it's Ryan or not." In other words, Mulhern's defense was that while they had certain contact, Lisa must have had intercourse with someone else.

¶57 With Mulhern arguing unambiguously that he did not have sex with Lisa and thereby any male DNA must have come from a different source, the prosecution called Lisa back to the stand. Lisa testified that she had not had sex with any other person in the week prior to the assault. After receiving this testimony, the State called back its DNA expert, who testified that the male DNA would generally remain in the vagina only five days after sexual contact. After hearing all the available

2

evidence, Mulhern was convicted of second-degree sexual assault.[1] Wis. Stat. § 940.225(2)(a) (stating that it is a Class C felony for anyone who has "sexual contact or sexual intercourse with another person without consent of that person by use or threat of force or violence").

¶58 The majority here errs in concluding that Lisa's testimony concerning the lack of sexual activity the week before the attack is barred under Wisconsin's rape shield statute, Wis. Stat. § 972.11. See majority op., ¶42. Specifically, the majority errs in concluding that it is Mulhern who is protected under the rape shield statute. According to the majority's reading of the rape shield statute, the statute protects the perpetrator of the assault from the inculpatory testimony of the victim. The testimony, if believed, would be evidence that Mulhern was the source of DNA found on Lisa's body. The majority applies the rape shield statute in a manner that harms rather than shields the victim. At a minimum, the defense that was offered "opened the door" to allowing Lisa to testify about the lack of an alternative source.

¶59 Quite often in sexual assault cases, juries have to weigh and consider competing versions of events and determine, in their search for the truth, which portion of the testimony they find more appealing to their good judgment and common sense. In other words, they have to decide who they believe.

---

[1] As part of the same criminal complaint, Mulhern was acquitted of a charge of strangulation, Wis. Stat. § 940.235(1), and was found guilty to misdemeanor bail jumping, Wis. Stat. § 946.49(1)(a).

Given the intimate nature of these offenses, victims of rape and sexual assault often provide very personal evidence to the police and assist in the prosecution of their assailants. Many times, sexual assault victims know their assailant and in fact may have had prior sexual relations.[2] See The Centers for Disease Control and Prevention, The National Intimate Partner and Sexual Violence Survey 22-23 (2011) (reporting that between 14% and 15% of rape victims were assaulted by a stranger and upward toward 50% of rapes are committed by friends and intimate

---

[2] The vast majority of rapes and sexual assaults are not reported. See U.S. Department of Justice, Criminal Victimization, 2018 8 (Sept. 2019) (stating that in 2017 and 2018 between 25% to 40% of sexual assaults and rapes were reported to police); National Sexual Violence Resource Center, Statistics About Sexual Violence 2 (2015) ("Rape is the most under-reported crime; 63% of sexual assaults are not reported to police."). Victims often do not want to make known details of how they were violated and publicly recount the extraordinarily traumatic events in their lives. Even when sexual assaults and rapes are reported, a minority lead to arrests. E.g., compare U.S. Department of Justice, supra 4, 8 (stating that there were 183,000 reported sexual assaults or rapes in 2018), with Federal Bureau of Investigation, Crime in the United States: 2018, https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-29 (last visited June 6, 2022) (explaining that there were 72,142 arrests for sexual assault and rape in the United States in 2018); Rape, Abuse, & Incest National Network, The Criminal Justice System: Statistics, https://www.rainn.org/statistics/criminal-justice-system (last visited June 6, 2022) (stating that out of 1,000 sexual assaults, 310 are reported to police and 50 reports lead to an arrest). Even when a victim reports a sexual assault or rape, and even when the State proceeds with prosecution, conviction rates are low. See U.S. Department of Justice, Felony Defendants in Large Urban Counties 22 (2013) (finding that "[t]he probability that a defendant would eventually be convicted of the original felony charge" was the "lowest . . . for charged with rape (35%) and assault (33%)"); Rape, Abuse, & Incest National Network, supra (stating that 2.8% of sexual assaults or rapes lead to a conviction).

4

partners). Often times, cases come down to a credibility determination between the victim and the defendant. See State v. Hurley, 2015 WI 35, ¶81, 361 Wis. 2d 529, 861 N.W.2d 174 (explaining in the context of a child sexual assault that many cases "boiled down to a credibility determination" in which the prosecution relies "on a single witness . . . frequently unsupported by physical evidence").

¶60 Before rape shield legislation, defendants in sexual assault cases would use a victim's sexual history to attack the credibility of the victim and the victim's story. Rape shield legislation was written to stop the practice. See State v. Vonesh, 135 Wis. 2d 477, 484, 401 N.W.2d 170 (Ct. App. 1986) (reasoning that the "objective of the [rape shield] reformers was to reverse the long-standing common law doctrine that permitted a defendant accused of rape to inquire into the complainant's 'character for unchastity,'" and was designed to "increase . . . the number of rape prosecutions by removing some of the potential for embarrassment or humiliation which inhibits victims from reporting crimes" (quoting Rape Law Review: A Brief Summary of State Action, Legislative Reference Bureau, Informational Bulletin 75-1B-1, at 6 (1975)); Wright & Miller, Federal Practice and Procedure, § 5372 (2d ed. 2022) (explaining that prior to rape shield legislation in the United States, "the defense in a rape case operated under few constraints" with respect to "evidence concerning the character of a rape victim and her prior sexual conduct," which made it "difficult to obtain convictions of rapists"); Sandoval v. Acevedo, 996

F.2d 145, 149 (7th Cir. 1993) (stating the origins of the rape shield laws, explaining that many rape and sexual assault victims had engaged in sex in the past, and "allowing defense counsel to spread the details of a woman's sex life on the public record not only causes embarrassment to the woman but by doing so makes it less likely that victims of rape will press charges").

¶61 Before the rape shield statute, a common argument was that "a woman of previous unchaste character is more likely to consent to an act of sexual intercourse than is a woman who is strictly virtuous." Kaczmarzky v. State, 228 Wis. 247, 249, 280 N.W. 362 (1938). A classic example of this defense tactic was addressed by the Indiana Supreme Court in Williams v. State, 681 N.E.2d 195 (Ind. 1997). In that case, the defendant, with the help of an accomplice, pulled the victim into a car, pointed a gun at the victim, and demanded the victim have sex with the defendant. Id. at 198. The victim escaped by grabbing the gun and opening the car door. Id. The defendant was convicted of attempted deviate conduct and criminal confinement. Id. On appeal, the defendant argued that the trial court wrongfully excluded evidence that "on prior occasions the victim had committed acts of prostitution in exchange for money or cocaine." Id. at 200. The defendant claimed this evidence "support[ed] his defense that the victim consented and accompanied the men because they had promised to obtain drugs for her." Id. The Indiana Supreme Court correctly concluded that this defense was barred by the rape shield law, reasoning

6

that "purported incidents with other men at other times [are] offered simply to show that the victim had consented in the past in the hope the inference will be drawn that she consented here." Id.

¶62 Here, the evidence produced is not that from a defendant who seeks to prove that Lisa's prior sexual acts or reputation are a form of propensity evidence. That would be protected by the rape shield law. In fact, the defendant is not introducing the evidence at issue, whether to embarrass or intimidate the victim or for any other reason. Instead, the State is introducing the victim's testimony in order to answer the defense that the DNA in the victim's vagina was from someone other than the defendant. Lisa reported her assault, assisted the police and prosecution, and testified in a public trial against her assailant. No testimony was elicited as to her reputation, character, or her predisposition to engage in sexual activity; it was offered in answer to the defense. The evidence provided was tailored in time and content, was highly relevant, and was fundamentally legitimate. If the jury instead concluded that the State had not proven that Mulhern had sexually assaulted Lisa, her responsive testimony was of no consequence.

¶63 Stated differently, non-conclusive DNA evidence was found in Lisa's vagina. Mulhern contends it is not his and must be someone else's because he did not have intercourse with her. Lisa answers that defense by stating that there can be no alternate sources because she did not have intercourse in the prior week. The DNA expert testified that DNA evidence of this

7

type does not last longer than five days. If the jury believed Mulhern's defense, her testimony would have been of no consequence. The jury believed Lisa, and Mulhern was convicted.

¶64 The plain text of Wisconsin's rape shield statute does not protect criminal defendants from evidence of the victim's lack of sexual activity. In sex crime prosecutions, "any evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct shall not be admitted into evidence." Wis. Stat. § 972.11(2)(b). "Sexual conduct" is defined as "conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life-style." § 972.11(2)(a). This statute is well in line with rape shield statutes throughout the country, which prohibit introduction of the victim's prior sexual acts and the victim's sexual reputation and predispositions. See, e.g., Fed. R. Evid. 412(a) (prohibiting evidence "that a victim engaged in other sexual behavior" and evidence of "a victim's sexual predisposition"); Fed. R. Evid. 404(a)(2) (allowing criminal defendants to introduce character evidence showing "the victim's pertinent trait," but subjecting that provision to "the limitations in Rule 412 [the federal rape shield]"); Ohio Rev. Code § 2907.02(D) ("Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual

8

activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section . . . .").

¶65 "Conduct" is defined as the "[m]anner of conducting oneself or one's life; behaviour; usually with more or less reference to its moral quality (good or bad)." Conduct, Oxford English Dictionary (2021). The definition includes how one behaves or acts; it does not include behavior or activity not attributed to the individual. Thus, "sexual conduct" cannot include conduct that is not sexual. Under the majority's reading, not engaging in sexual conduct is sexual conduct.

¶66 The statutory explanation of "sexual conduct" further supports this conclusion. Wisconsin Stat. § 972.11(2)(a) states that sexual conduct includes "conduct or behavior relating to sexual activities." "Sexual activities" makes it even clearer that the statute is referring to actions of the victim that are sexual in nature. "Activity" is defined as "[t]he state of being active; the quality or condition of being an agent or of performing an action or operation; the exertion of energy, force, or influence." Activity, Oxford English Dictionary (2021). Thus, "sexual activity" is the state of a being active and engaging in sex or sexual behavior. The definition and plain meaning of sexual activity does not encompass the lack of action or behavior. It is commonly understood that sexual "activity" and sexual "acts" involve engaging in sexual behavior, not abstaining or engaging in non-sexual behavior. See, e.g., Sexual Activity and Satisfaction in Healthy Community-dwelling Older Women, U.S. National Library of

9

Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3246190/ (study testing the existence of "sexual activity" by asking whether the subjects engaged in sexual acts or intercourse); Trends in Frequency of Sexual Activity and Number of Sexual Partners Among Adults Aged 18 to 44 Years in the US, 2000-2018, JAMA Network, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2767066 (measuring "sexual activity" in the United States by inquiring into "sexual frequency and number of sexual partners"); see also Sexually Active, Merriam-Webster (2021) ("[E]ngaging in sexual relations." (Emphasis added.)). When a doctor asks whether a patient has been sexually active, no rational patient would answer "yes" when the patient has abstained from sex.

¶67 The statutory context of Wisconsin's rape shield law supports this meaning. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted in the context in which it is used."). Wisconsin's rape shield statute includes three exceptions. In conformity with the plain meaning of sexual conduct and activities, all three exceptions involve some form of sexual behavior or activity. Evidence of sexual activity can be admitted to show "complaining witness's past conduct with the defendant"; "specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered"; and "prior untruthful allegations of sexual assault made by the complaining witness." Wis. Stat. § 972.11(2)(b)1.-

10

3. The first exception applies only if there is sexual conduct with the defendant to introduce; evidence that the victim never met the defendant is not included in the first exception. The second exception involves sexual conduct where there is a dispute over the origin of physical evidence. This exception facially would have no relevance if the victim did not engage in sexual activities or behaviors. Finally, the third exception includes accusations of sexual conduct the victim made in the past. The exception does not cover victim allegations that no sexual activity occurred. Therefore, the plain text of § 972.11(2) supports the conclusion that Lisa's testimony that she did not engage in sexual activities in the week prior to Mulhern's assault was admissible and proper.

¶68 But is it practicable to have a rule whereby the lack of sexual conduct is admissible under the rape shield statute? Absolutely, in particular when the victim wishes to introduce it as an answer to a defense. While a victim need not so testify, it could be offered to complete the facts for the jury.

¶69 Other states have adopted that position, some for many years. See, e.g., Forrester v. State, 440 N.E.2d 475, 479 (Ind. 1982) (holding that evidence of the victim's virginity in proving the victim's hymen was recently torn was not barred by the rape shield statute, reasoning that "[i]t is the victim, not the accused, that the statute was designed to shield"); People v. Johnson, 671 P.2d 1017, 1020 (Colo. App. 1983) (explaining that the rape shield statute "protect[s] rape and sexual assault victims from humiliating public fishing expeditions into their

11

past sexual conduct," but it does not prohibit "the victim from testifying as to the <u>lack</u> of prior sexual activity"); <u>People v. Sharpe</u>, 918 N.W.2d 504, 513 (Mich. 2018) (holding that evidence that the victim did not engage in sex with a man other than the defendant during the relevant period, in conjunction with evidence of pregnancy, was not barred by the rape shield statute, explaining that the statute did not apply where the victim "has voluntarily offered evidence of her pregnancy, abortion, and lack of sexual history to bolster her allegations of criminal sexual conduct"); <u>see also</u> <u>State v. Boggs</u>, 588 N.E.2d 813, 816-17 (Ohio 1992) (distinguishing false statements of a victim where no sexual activity was involved, thus falling outside the rape shield, from those statements where sexual conduct did in fact take place, which would be covered by the rape shield).

¶70 The majority states that rape shield statutes from other states like Michigan have different meanings because they include the words "specific instances." <u>See</u> majority op., ¶¶37-39. The Michigan rape shield statute prohibits evidence of "specific instances of the victim's sexual conduct." Mich. Comp. Laws § 750.520j(1). But the addition of "specific instances" only emphasizes the plain meaning of "sexual conduct." If, as the majority holds, "sexual conduct" includes the lack of sexual conduct, why would that meaning change if the words "specific instances" are included before it? The inclusion of "specific instances" does not materially change the meaning of "sexual conduct."

12

¶71 Sexual activity does not include the lack of sexual activity. And the lack of sexual behavior does not become sexual behavior simply because the scope of consideration is widened from a specific instance to a longer period of time. The inclusion of the words "specific instances" brings to the fore just how detached non-sexual activity is from sexual activity. This analysis lends weight to the conclusion that the lack of sexual activity is not covered by the rape shield law. Just as in Michigan, the Wisconsin rape shield law does not prohibit a victim from "voluntarily offer[ing] evidence of her . . . lack of sexual history to bolster her allegations of criminal sexual conduct against defendant." Sharpe, 918 N.W.2d at 513.[3]

---

[3] Under the majority's reasoning, the term "specific instances" supports the conclusion that the lack of sexual conduct is excluded from the definition. See majority op., ¶¶38-39 (stating, "[w]e agree" that the inclusion of the words "specific instances" is a distinguishing feature of the Michigan rape shield statute). If that is true, the second exception to the rape shield statute unambiguously does not apply to the lack of sexual activity. Wis. Stat. § 972.11(2)(b)2. (stating that "[e]vidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease" may be used to determine "the degree of sexual assault or the extent of injury suffered" (emphasis added)). Therefore, if the DNA found in Lisa's vagina were derived from semen, under the statute, Mulhern would be able to introduce evidence showing that the source of the semen was from another man with whom Lisa had sex (which in this case did not exist). Because the majority holds that the lack of sexual conduct is covered under the rape shield statute and reasons that the words "specific instances" incorporate conduct alone, Lisa and the prosecution would not be able to introduce evidence that she did not engage in sex with another man.

13

¶72 Would permitting the victim to present evidence on the lack of sexual history unjustifiably prejudice the defendant? No. It provides an answer to the defense presented in this case. The defense here was responded to by Lisa offering to testify about her lack of sexual activity in the relevant timeframe for this assault.

¶73 All testimony admitted into evidence must be relevant and cannot be unduly prejudicial. See Wis. Stat. §§ 904.02, 904.03. No party contends that Lisa's testimony here was irrelevant, unfairly prejudicial, or duplicative. In fact, the testimony was immensely relevant to a central issue in the case: whether the DNA evidence was derived from Mulhern or another man. Furthermore, Lisa's testimony only had weight to the extent that the jury found her credible. Lisa's testimony merely supplemented expert testimony that male DNA would not remain in the vagina longer than five days. Regardless of Lisa's testimony, the jury could have concluded that the male DNA was derived from someone other than Mulhern.

¶74 No one argues that the admission of this evidence prevented Mulhern from presenting a full defense. Further, the rape shield statute has an exception that allows defendants such as Mulhern to introduce evidence of prior sexual history to prove the "source or origin of semen, pregnancy or disease." Wis. Stat. § 972.11(2)(b)2.; see also Sandoval, 996 F.2d at 149 ("[A] rape shield statute cannot constitutionally be employed to deny the defendant an opportunity to introduce vital evidence."); Gagne v. Booker, 680 F.3d 493, 514 (6th Cir. 2012)

14

(explaining under established United States Supreme Court precedent, "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense——such that the court may not exclude competent, reliable evidence central to the defendant's claim of innocence, in the absence of any valid state justification" (cleaned up)); Sharpe, 918 N.W.2d at 513 n.10 ("[Under the Constitution] [t]he admission of [the lack of sexual conduct] may open the door to the introduction of evidence whose admission may otherwise have been precluded by the rape-shield statute.").

¶75 Under existing law, Mulhern already had the right to introduce evidence proving that physical evidence of the crime came from another individual. The unfortunate result of the majority's holding is that sexual assault victims are prohibited from fully contesting that defense even if they wish to so testify.

¶76 Wisconsin rape shield caselaw has stated that victims are barred from presenting testimony on the lack of their sexual history. See State v. Clark, 87 Wis. 2d 804, 810, 275 N.W.2d 715 (1979); State v. Gavigan, 111 Wis. 2d 150, 159, 330 N.W.2d 571 (1983); State v. Mitchell, 144 Wis. 2d 596, 600, 609, 424 N.W.2d 698 (1988); State v. Bell, 2018 WI 28, ¶63, 380 Wis. 2d 616, 909 N.W.2d 750. However, this conclusion was based on the State's concessions. Instead of precedent based on concessions, we should rely on the existence of strong adversarial briefing and litigation. See State ex rel. First Nat'l Bank of Wis. Rapids v. M&I Peoples Bank of Coloma, 95

15

Wis. 2d 303, 309, 290 N.W.2d 321 (1980) (reasoning that the whole premise of standing in court is to "insure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution"). Because the State conceded these points in prior cases, the Wisconsin Supreme Court did not provide detailed or thorough analysis. See Clark, 87 Wis. 2d at 810; Gavigan, 111 Wis. 2d at 159; Mitchell, 144 Wis. 2d at 600, 609; Bell, 380 Wis. 2d 616, ¶63. Prosecutors have an obligation to fully and zealously represent the interests of the State, just as defense attorneys must fully represent their clients. See In re Disciplinary Proceedings Against Kraemer, 200 Wis. 2d 547, 557, 547 N.W.2d 186 (1996) ("The attorney-client relationship is grounded in trust: the client's justifiable expectation that the lawyer retained will act in the client's best interests."). While the State's newly asserted legal arguments are correct, for a majority of this court the State's positions are too little, too late. The State's concessions of the past should not impact our full analysis of the statutory language at issue.

¶77 We should not be bound by our prior precedents, which were the product of party concessions and did not involve thorough vetting and analysis. Compare State v. Roberson, 2019 WI 102, ¶¶51-57, 389 Wis. 2d 190, 935 N.W.2d 813 (overturning a decision from this court when it was not legally supported by United States Supreme Court precedent upon which the decision was based), with Hennessy v. Wells Fargo Bank, 2022 WI 2, ¶32,

16

400 Wis. 2d 50, 968 N.W.2d 684 ("There is no indication that the prior decisions were wrongly decided, unsound in principle, or subject to change due to newly ascertained facts."); see also State v. Jackson, 2011 WI App 63, ¶14, 333 Wis. 2d 665, 799 N.W.2d 461 (agreeing that "a concession for the sake of argument, which is adopted by the supreme court and is not thereafter the subject of studied discussion, cannot be considered as a holding worthy of precedential value").

¶78 Instead, the majority should apply the plain language of Wis. Stat. § 972.11 and conclude here that the lack of sexual conduct is not sexual conduct when the victim wishes to counter a defense such as the one here. The rape shield statute protects victims from harassment and intimidation. Vonesh, 135 Wis. 2d at 484; Wright & Miller, supra ¶60 § 5372; Sandoval, 996 F.2d at 149; see Kaczmarzky 228 Wis. at 249; Williams, 681 N.E.2d at 200. It should not protect sexual assailants from having their victims provide relevant testimony against them.

¶79 Of course, it is within the province of the Legislature to consider whether Wis. Stat. § 972.11 should be amended so that victims can provide willing and relevant evidence at sexual assault trials. The rape shield statute should not hinder victims' ability to assist in the prosecution of their assailants. It is written to be a shield for the victim, not a sword used by the defense.

¶80 I agree with the majority that the evidence in this case is overwhelming. I disagree that there was error. As the majority correctly concludes, the exclusion of Lisa's testimony

as to the lack of her sexual conduct was in this case harmless. Majority op., ¶¶43-52. That will not always be the case. And under the majority's reading of the rape shield law, the prosecution and victim will be prohibited from fully contesting the defense. In the process, truth will be a casualty, and justice with it.

¶81 Because the rape shield statute does not always prohibit victims from testifying against their assailants regarding the lack of sexual conduct, I respectfully concur.

¶82 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence.